UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RICHARD COSBY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-04201-JMS-MPB |
| | ) | |
| THE CITY OF INDIANAPOLIS, | ) | |
| INDIANAPOLIS METROPOLITAN POLICE | ) | |
| DEPARTMENT, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY

Plaintiff Richard Cosby, an African-American man, is a police officer with the Indianapolis Metropolitan Police Department ("the IMPD," which is a division of Defendant City of Indianapolis) who brought suit after receiving numerous suspensions for what he claims were pretextual covers for race discrimination. He also claims that, by repeatedly singling him out for unwarranted discipline, the IMPD has subjected him to a hostile work environment. But Officer Cosby's Title VII claims fail because the large portions of the lone exhibit he tendered—his own affidavit—fail to establish personal knowledge over the conclusions they assert and, more importantly, are the subject of legitimate yet uncontested evidentiary objections. Left almost solely with the facts as set forth by the IMPD, the Court concludes that Officer Cosby has not met his burden to show that a reasonable jury could find in his favor and therefore **GRANTS** the IMPD's Motion for Summary Judgment. [Filing No. 36.]

## I.
### LEGAL STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not suffice to defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party

and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### EVIDENTIARY OBJECTIONS

The result in this case turns in part on the admissibility of large portions of Officer Cosby's affidavit, [Filing No. 43-1], the sole piece of evidence he offers to demonstrate a genuine issue of material fact. In his affidavit, Officer Cosby offers his version of the events that led to his suspensions as well as assertions regarding the conduct and discipline of other officers. The IMPD objects on foundation grounds to paragraphs 8, 28, 33, 34, 56, 65, and 88 and on hearsay grounds to paragraphs 78 through 84 of the affidavit. [Filing No. 45 at 3-4.] For the most part, the foundation objections argue that Officer Cosby has failed to provide evidence that he has personal knowledge of the facts he asserts. [Filing No. 45 at 3-4.] Officer Cosby did not file a surreply to respond to these objections.

Unlike some other jurisdictions, the Southern District of Indiana's Local Rules "expressly permit[] surreply briefs to be filed as of right in this situation—to respond to evidentiary objections made in a reply brief." *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 596 (7th Cir. 2017) (citing S.D. Ind. L.R. 56-1(d)); S.D. Ind. L.R. 56-1(d) ("A party opposing a summary judgment may file

a surreply brief [where] the movant . . . objects to the admissibility of the evidence cited in the response.").  Local Rule 56-1(d) provides nonmovants with "a meaningful opportunity to be heard on . . . evidentiary issues," *Ennin*, 878 F.3d at 596 (internal quotation omitted), such that Mr. Johnson could have either responded to the merits of the IMPD's objections or addressed any shortcomings in his previous filings "with a supplemental affidavit or two," *Cehovic-Dixneuf v. Wong*, 895 F.3d 927, 932 (7th Cir. 2018).  But where a party elects not to file a brief that is "permitted as a matter of right," the party "risk[s] waiver of any arguments it has neglected to raise."  *Ennin*, 878 F.3d at 596.

Officer Cosby had the opportunity under Local Rule 56-1(d) to file a surreply to respond to IMPD's evidentiary objections and did not do so.  "By not presenting his arguments to [this Court], he [has let IMPD's] objections to the evidence stand unopposed."  *Id.* at 569.  The IMPD's foundation objections are facially meritorious.  Federal Rule of Evidence 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Officer Cosby provides no basis for his belief, in paragraph 8 of his affidavit, that "most officers wanted to take their lunch break around 2:00 p.m.," and given that the officers are spread throughout their zones and districts, [*cf.* Filing No. 43-1 at 7 (averring that officers must be in their "district ready to take runs" at the start of their shifts)], it is far from obvious how he would know this information.  The same is the case with paragraph 28, in which Officer Cosby avers that "Sergeant Wilson was a white officer who I felt did not like African-Americans."  [Filing No. 43-1 at 3.]  What Officer Cosby feels about Sergeant Wilson is irrelevant, *see, e.g.*, *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016), and Officer Cosby provides no evidence (for example, personal observation of improper comments or conduct) to support the inference he actually wants the Court to draw—that Sergeant Wilson in fact does not

like African-Americans and therefore discriminated against Officer Cosby. The same issues pervade the other portions of Officer Cosby's affidavit to which the IMPD objects on foundation grounds. In light of Officer Cosby's waiver in failing to respond to the IMPD's facially meritorious foundation objections, the Court **SUSTAINS** the IMPD's objections to the challenged portions of paragraphs 8, 28, 33, 34, 56, 65, and 88 of Officer Cosby's affidavit.

Though Officer Cosby has also waived any response to the IMPD's hearsay objections, those objections lack the facial merit of the foundation objections. Out-of-court statements qualify as hearsay only when they are offered to "prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). They are not hearsay when offered for any other purpose, such as to explain why someone acts or does not act a certain way. *E.g.*, *United States v. Sanchez*, 32 F.3d 1002, 1005 (7th Cir. 1994) (affirming admission of out-of-court statement which was "not offered to prove the truth of the matter asserted, but only to prove why [the individual] acted as he did"). The out-of-court statements of a man who talked to Officer Cosby about his missing daughter are not offered to prove that the man's daughter was actually with her mother, that his daughter was not in danger, or that everything was fine, but instead are offered to explain why Officer Cosby responded the way he did to the call. [Filing No. 43-1 at 8.] They are therefore not hearsay under Rule 801(c)(2), and, despite Officer Cosby's waiver, the Court **OVERRULES** the IMPD's hearsay objections to paragraphs 78 through 84 of his affidavit.

### III.
#### BACKGROUND

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the

party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.  Officer Cosby's Employment Record

In September 2000, Officer Cosby joined the Indianapolis Police Department which, following consolidation with the sheriff's police force, became the IMPD in January 2007.[1] [Filing No. 43-1 at 1]; *see* [Filing No. 38-3 at 1]; Indianapolis, Ind. Rev. Code of the Consol. City & Cnty. § 279-102 (hereinafter "Indianapolis Code").  After completing his training and probationary period, IMPD assigned Officer Cosby to the West District as a middle-shift patrol officer.  [Filing No.43-1 at 1.]  On January 1, 2005, Officer Cosby was transferred to a day-shift assignment in the Northwest District.  [Filing No. 43-1 at 1.]  In January 2011, Officer Cosby shifted to second roll call in the Northwest District.  [Filing No. 38-3 at 2.]  Officer Cosby transferred to late shift in July 2016.  [*See* Filing No. 37 at 2 (IMPD's uncontested assertion of fact); Filing No. 43-1 at 8 ("On October 16, 2016, I was working the late shift . . . .").]

While the disciplinary procedures have changed during Officer Cosby's tenure with the IMPD, [*see* Filing No. 38-2 (General Order 3.18, implementing "disciplinary matrix" effective December 1, 2015)], throughout his tenure officer discipline has been subject to review by a Disciplinary Board of Captains.  *See, e.g.*, Indianapolis Code § 279-237(g); [Filing No. 38-4 (2002 findings from Indianapolis Police Department Board of Captains)].  The Disciplinary Board of Captains consists of three randomly selected captains who each serve a three-month term. Indianapolis Code § 279-237(j).  The Board may hold a hearing on a charge of officer misconduct,

---

[1] The Court follows the parties' lead in omitting separate references to the Indianapolis Police Department, for which Officer Cosby worked prior to the merger, and instead referring to Defendants throughout simply as "IMPD."  *See also* Indianapolis, Ind. Rev. Code of the Consol. City & Cnty. § 279-102(a) ("The [IMPD] constitutes the legal successor-in-interest to both the Indianapolis Police Department and the county police force of the sheriff's department.").

and the officer may be represented by counsel and subpoena witnesses. *Id.* § 279-237(h). The Board also makes findings as to the disposition of any alleged rule violations and recommendations as to the appropriate sanction. *Id.* § 279-237(i). The chief of police reviews the Board's findings and recommendations and may concur in or reverse its decision. *Id.*

### 1. February 2002 Suspension

Officer Cosby's first disciplinary incident occurred on November 30, 2001, when he failed to locate and take a razor blade from a prisoner before turning the prisoner over to jail staff. [Filing No. 38-4 at 1.] On January 14, 2002, the Disciplinary Board of Captains recommended that Officer Cosby receive a one-day suspension, [Filing No. 38-4 at 1], which was approved by Chief Jerry Barker on January 23, 2002, and imposed on February 10, 2002, [Filing No. 38-4 at 2-3]. Officer Cosby acknowledges that the incident "was a mistake that I made[,] and I never disputed the discipline." [Filing No. 43-1 at 1.]

### 2. May 2014 Suspension

In May 2014, Officer Cosby received a one-day disciplinary suspension after a message exchange with Sergeant Michael Jefferson. [Filing No. 38-5.] The Disciplinary Board of Captains report described the incident as follows:

> On March 18, 2014, Sgt. Michael Jefferson was checking unit status and noticed Officer Cosy had changed zone assignments. He inquired of him about the zone assignment change via the laptop computer with the following questions and responses:
> Sgt.  Did you talk with a supervisor about changing your zone assignment.
> A.  I sure did before u came to the shift. It was 114's idea.
> Sgt.  It was his idea before I came to the shift?
> A.  Yep. I have been doin it for awhile. The middle shift 10's car don't like me and I don't care for them.
> Sgt.  When I first came to the shift I noticed that. But you stopped for a long time. As far as I am concerned you need to stay on your assigned zone. I'll talk with Sgt. Suesz and the Lt. to get their input.
> A.  (almost two hours later) We should do that good idea, the 4 of us should sit down and talk because I'm sick and tired of you.

[Filing No. 38-5 at 1.] The Board recommended a three-day suspension citing, among other things, the IMPD policy providing that "[m]embers shall not be insubordinate or act with disrespect to any supervisor or appointed police administrator." [Filing No. 38-5 at 1.] Acting Chief Ronald

Hicks accepted the Board's findings and imposed a one-day suspension effective May 27, 2014. [Filing No. 38-5 at 2-3.]

For his part, Officer Cosby does not deny that the March 18, 2014, message exchange occurred. He does, however, provide additional context for the incident. In March 2014, Sergeant Jefferson asked Officer Cosby whether he had permission to change his zone assignment. [Filing No. 43-1 at 2.] Officer Cosby told Sergeant Jefferson, who was not Officer Cosby's supervisor, that he had received permission to change zones. [Filing No. 43-1 at 2.] Sergeant Jefferson "had been picking at [Officer Cosby] pretty hard" and, as reflected in the message exchange, told Officer Cosby that he would talk with Sergeant Roger Suesz and the Lieutenant. [Filing No. 43-1 at 2.] The incident led to a meeting between Sergeant Jefferson, Sergeant Karen Dague, and Captain Harold Turner. [Filing No. 43-1 at 2.] Captain Turner told Sergeant Jefferson and Sergeant Dague that Officer Cosby could "either go to Wellness and get checked out, or [he] could take a one-day suspension." [Filing No. 43-1 at 2.] Officer Cosby "went to Wellness to get checked out" and "was cleared," but still received the one-day suspension. [Filing No. 43-1 at 2-3.]

### 3. December 2014 "Coaching Expectations" Memorandum

Sometime after the incident with Sergeant Jefferson, Sergeant T. Michael Wilson joined Officer Cosby's shift. [Filing No. 43-1 at 3.] Officer Cosby welcomed Sergeant Wilson and congratulated him on his promotion. [Filing No. 43-1 at 3.] Sergeant Wilson replied, "I heard about you and I will be keeping my eyes on you." [Filing No. 43-1 at 3.]

On December 31, 2014, Sergeant Wilson sent Officer Cosby an "Inter-Department Communication" regarding "Coaching expectations." [Filing No. 38-6 at 1.] The document provided as follows:

Officer Cosby,

This interdepartmental is in reference to the your coaching for unwillingness to perform assigned duties.

Corrective actions for day shift;

Will arrive to work on time and logged onto his assigned zone.

Will check his department e-mail in a timely manner to check daily zone assignment.

Will contact an on duty day shift supervisor for approval prior to changing zone assignments.

Will keep Z-Client messages professional in nature.

Will comply with assignments changes in a timely manner and will contact an on duty day supervisor respectfully if he has questions or concerns regarding the given assignment.

Officer Cosby further understands that his and other officers shift zones preference will be used in assigning daily zone assignments, but that the mission and manpower of the shift may result in changes. Officer Cosby also understands that the assignment of zones is ultimately at the discretion of the on duty shift supervisor based on current staffing, manpower and mission of the department.

[Filing No. 38-6 at 1.]

### 4. February 2015 Performance Review

On February 17, 2015, Sergeant Suesz, who supervised Officer Cosby at the time, issued the following written performance review:

Officer Cosby's performance has caused several officers to complain about working with him. All of the dayshift supervisors have been approached by other officers about Officer Cosby, specifically showing up to runs late, not sharing the run load or report load, and marking out on PWPs for an excessive amount of time. Other shift supervisors have came to us complaining about his performance which caused another administrative supervisor to pull several daily CADs and stats on Officer Cosby which showed his performance to be very low. Lt King spoke to him about being marked out at the garage for an hour and a half at the end of his shift even though he never went to the garage but was able to avoid taking any runs during that time. His self initiated activity is very low in quantity. Dayshift supervisors will work with him to be more active in taking runs, increasing his self-initiated activities, and sharing the run/report load and we will be monitoring his stats in order to get him up to at least the average performance of the shift.

[Filing No. 38-7 at 1.][2]

---

[2] The parties explain that "marking out" means that an officer is unavailable due to an ongoing call or other issue. [Filing No. 37 at 4.] "PWPs" is an acronym that means "Patrol When Possible." [Filing No. 43 at 4.]

Officer Cosby believed that the review "was harassment because I had taken all possible radio runs." [Filing No. 43-1 at 3.] The other officers on Officer Cosby's shift ridiculed him and laughed at him after he was told that he needed to increase his self-initiated activities.[3] [Filing No. 43-1 at 4.]

During his review, Officer Cosby presented Lieutenant Wheeler with a list of concerns and documentation which demonstrated that other officers had failed to "show[] up for runs" or had "show[ed] up late."[4] [Filing No. 43-1 at 4.] According to Officer Cosby, "Lieutenant Wheeler dismissed my concerns and told me that if I have time to document, I have time to make stops." [Filing No. 43-1 at 4.]

### 5. March 2015 Counseling Session

On March 13, 2015, Lieutenant Wheeler had a counseling session with Officer Cosby and discussed his February 17 evaluation, among other subjects. [Filing No. 38-8 at 1.] Lieutenant Wheeler memorialized his counseling session as follows:

---

[3] The remainder of Officer Cosby's factual assertion, suggesting why the other officers ridiculed him, is excluded pursuant to the Court's ruling in Part I on the IMPD's evidentiary objections.

[4] Officer Cosby did not submit this documentation to the Court, however.

On 03-13-15 I had a counseling session with Officer Richard Cosby. During this counseling session I talked to him about several items. One was his lack of proactivity during his shift hours. I had talked to him on 02-17-15 during his evaluation that he needed to be more proactive and make some self-initiated police activities during his shift. I asked him if he had made any proactive stops during the last month and he stated no that he had not. I asked him why and he stated that he had been moved from his favorite zone 30 and he was no longer working with his friend Rodney White so he was not going to do anything proactive because he felt he was being punished. I explained to him that he had to work on the zones he was given and not just when he wanted, where he wanted to. I told him that I would require that he start filling out a daily activity log so that he and I could have an understanding of what he did on a daily basis. I also stated my continued requirement that he be active on a proactive basis.

I also talked to him about not marking back in service after a run. Sgt. Kistner notified me that Officer Cosby had been out on an accident report for over an hour that Officer White had already taken. Officer Cosby stated that he had just forgotten to mark in service.

I also talked to him about an stolen verification that he took on 03-05-15 at 0855 hours in the morning but at 1723 hours the vehicle had not been entered. Middle shift took a run on this car and had a difficult time determining that this car was stolen.

These events are showing the picture that Officer Cosby is continuing to have performance issues.

[Filing No. 38-8 at 1.]

Officer Cosby disputes Lieutenant Wheeler's version of events, maintaining that his "comments and characterization of our conversation was completely untrue." [Filing No. 43-1 at 4.] Specifically, Officer Cosby told Lieutenant Wheeler that he had made many proactive stops and engaged in self-initiated activity, but only issued warnings, which, unlike stops where a ticket is issued, are not accounted for with records.[5] [Filing No. 43-1 at 4.] Officer Cosby also did not complain about no longer working with Rodney White because "Rodney did not even work" in the zone from which he was moved. [Filing No. 43-1 at 4.] Officer Cosby mentioned his list of ignored concerns that he had previously provided to Lieutenant Wheeler. [Filing No. 43-1 at 5.]

---

[5] The parties' briefing explains that "proactive stops" and "self-initiated activity" both refer to situations to which police respond without having been dispatched. [Filing No. 37 at 4; Filing No. 43 at 5.]

Finally, Officer Cosby asked Lieutenant Wheeler who had been complaining about him, but Lieutenant Wheeler did not respond. [Filing No. 43-1 at 5.]

### 6. April 2015 Counseling Session

On April 8, 2015, Sergeant Wilson counseled Officer Cosby on prompt reporting, timeliness in reporting, and meal break timing. [*See* Filing No. 38-10; Filing No. 38-11.] The specific list of "Goals/expectations" provided as follows:

> Cosby Goals/expectations 4-8-15
>
> 30 patrolman
>
> Help with Interact.
>
>     Had a 60 minute training session on 4-8-15
>
> Will be on Zone at 0700 on non-roll call days
>
> Will call if going to be late
>
> Will advised if leaving zone, errand, running home, dinner break far off zone
>
> Will not take dinner break after 1400
>
> Will continue to turn in daily run logs
>
> Will get reports approved by day shift supervisors.
>
> Will share the run and report load with zone partners and while continuing to increase overall production.

[Filing No. 38-10 at 1.] Sergeant Wilson further memorialized the counseling in a memorandum to Chief Richard Hite, dated November 24, 2015:

> Chief,
>
> On April 8, 2015 I held a counselling session with officer Cosby. In the session one of the points that was clearly addressed was that he was not to take his dinner break after 1400. This was due to Ofc. Cosby being assigned to the 2nd roll call.
>
> One of the functions of the 2nd roll call officers is to assist with the run load and transition between days and middle shifts. By being out of service at the busiest time it was discussed with Ofc. Cosby that it is not fulfilling the roll and assignment of a 2nd roll call officer. He stated that he understood that and the other items on the list.

[Filing No. 38-11 at 1.]

The most important time for second roll call officers is the shift-change period from 1:30 to 2 p.m. [Filing No. 43-1 at 6.] During this period, second call officers take as many runs as they can to reduce the need for first shift officers to take runs that could extend beyond 2 p.m. and cause them to take overtime. [Filing No. 43-1 at 6.]

### 7. June 2, 2015 Suspension

Following the March 13, 2015 counseling session, Lieutenant Wheeler, Commander Dawn Snyder, Sergeant Wilson, Captain Turner, and Sergeant Dague held a meeting with Officer Cosby.[6] [Filing No. 43-1 at 5.] Officer Cosby was told that it would be an informal meeting to address his concerns. [Filing No. 43-1 at 5.] During the meeting, Commander Snyder told Officer Cosby that he "should be ashamed of [his] productivity." [Filing No. 43-1 at 5.] Officer Cosby told those gathered that "Lieutenant Wheeler had lied and that he refused to address concerns." [Filing No. 43-1 at 5.] In response, Captain Turner said, "If a lieutenant says it happened, it happened." [Filing No. 43-1 at 5 (emphasis omitted).] Officer Cosby told the supervisors, "If I have concerns, aren't you supposed to address them?" [Filing No. 43-1 at 5 (emphasis omitted).] They did not respond to Officer Cosby's comment. [Filing No. 43-1 at 5.]

As a result of the March 13, 2015 counseling session with Lieutenant Wheeler, Officer Cosby faced disciplinary charges for detrimental conduct, repeated violations of policies, and insubordination. [Filing No. 38-9 at 2.] Based upon Captain Turner's comment at the meeting, Officer Cosby decided that there would be "no point in requesting a hearing" because he "had already presented evidence that was dismissed" and had been "told by the Captain that a

---

[6] Officer Cosby does not pin down the timing of the meeting, though he makes clear that it happened sometime between the April 2015 counseling session and his June 2015 suspension.

Lieutenant's word trumps mine." [Filing No. 43-1 at 5.] On May 18, 2015, the Disciplinary Board of Captains recommended that Officer Cosby be suspended for three days and subject to monitoring for proactive work. [Filing No. 38-9 at 2-3.] Assistant Chief James Waters adopted the recommendation on May 28, 2015 and imposed the three-day suspension to begin on June 2, 2015. [Filing No. 38-9 at 1.]

### 8. June 5, 2015 Suspension

After a series of communications from Sergeant Wilson, Captain Turner, and Commander Snyder regarding Officer Cosby's lack of preparedness for making police runs, Officer Cosby again faced discipline. [Filing No. 38-12 at 3-6.] On March 21, 2015, roll call was cancelled, but officers were expected to nonetheless be ready to take runs at 7 a.m. [Filing No. 38-12 at 1-2.] As memorialized in a memorandum dated April 7, 2015, Sergeant Wilson was concerned about whether Officer Cosby would actually begin work on time, and visited Officer Cosby's house:

On March 21, 2015 Saturday, I went to Officer Cosby's residence to see what time he was leaving for work. I arrived and parked across the street from the apartment complex at 0645 and waited for Officer Cosby to mark on duty and leave for his assignment. (This was a gated community, but on foot I was able to see the marked vehicle backed into a space in front of his apartment). While waiting, I observed by the CAD, Officer Cosby used his laptop and logged on duty at 0658 and marked out at roll call (3821 Indrustral Blvd). Officer Cosby was clearly not at Roll Call. At 0704 Officer Cosby marked in-service, but no sign of the vehicle moving. At 0713, Officer Cosby was assigned a PWP by control and marked back in-service. The car still had not moved.

At 0715 as I had yet to see movement and the gate was open, I went to check on Officer Cosby. As I drove past Officer Cosby's car, I noticed that it was still covered with the morning dew. I observed the front windshield wipers move and clear the windows for the 1st time. I clearly saw Officer Cosby sitting behind the wheel of the car. This is a violation IMPD rules and regulations Section IV Subsection A, by Officer Cosby stating by Laptop that he was at work "specifically roll call where he marked out at" when he wasn't and hadn't even left his house.

. . .

> [. . .]     We had a discussion with Officer
> Cosby on the following day on 3-22-15. Officer Cosby was confronted as to why he was in his car when I drove
> past him at 0715. He stated that he saw me and that he was logged on and ready to take runs. I asked him why he
> was not on his assigned zone? He stated that he was on his district and logged on. I again asked why he was not
> on his Zone? He said that everyone does it.
>
>     I then confronted him as to the fact that I believed that he had logged on at roll call for work from his "kitchen
> table" inside his house. He kind of shrugged and said again I was ready to take runs on my district. I advised
> Officer Cosby that he was assigned the zone 60 and not zone 70. He again just said that he was ready for runs.

[Filing No. 38-12 at 3-4.]

On May 28, 2015, after review by the Disciplinary Board of Captains, Assistant Chief

Waters issued the following Disciplinary Action:

> The Disciplinary Board of Captains has reviewed the discipline issued to you for violation of departmental
> rules and regulations on March 21, 2015 when you were observed at your residence but logged on duty
> and them marking out at roll call.     You then marked in-service but were still at your residence.
>
> When confronted by Sgt. Wilson about logging in to roll call for work from his kitchen table, you shrugged
> and said you were "ready to take runs on your district." Sgt. Wilson advised you that you were assigned to
> Zone 60 and were not on your zone.     Again you responded "you were ready for runs"
>
> You have two previous disciplinary actions for insubordination and conduct unbecoming.     A remediation
> plan was initiated at the time of your most recent past discipline resulting in no improvement.
>
> ### Determination
>
> The Disciplinary Board of Captains has found you to be guilty as charged.     I am in agreement with their
> findings and have determined the following actions will be taken:
> - You will receive a suspension of 7 days
> - You are ordered to complete a Fitness for Duty Evaluation to determine your ability to continue to
>   perform as a police officer.
> - You will be on Performance probation for 12 months with monthly evaluations on your
>   professional conduct, performance and self-initiated activity.
> - At the conclusion of the 12 month period your District Commander will review your performance
>   and report your progress to me.
> - Non-compliance will result in further sanctions or disciplinary action up to and including
>   termination.

[Filing No. 38-12 at 1.]  In addition to the fitness-for-duty evaluation and the 12-month probation

period, Assistant Chief Waters imposed a seven-day suspension to begin June 5, 2015.  [Filing No.

38-12 at 1.]

But, according to Officer Cosby, whose evidence-backed assertions the Court must credit

on summary judgment, the dayshift rules did not require that officers be in their assigned zone at

the time their shift started. [Filing No. 43-1 at 6.] Rather, he was required only to be in his assigned district, ready to take calls. [Filing No. 43-1 at 6.] Officer Cosby complied with this requirement because his apartment is in his assigned district and he was ready to take calls. [Filing No. 43-1 at 6.] Additionally, Officer Cosby did not mark himself out, but instead the control operator marked Officer Cosby out on a "Patrol When Possible," as occurs with all officers, and was then marked back in service. [Filing No. 43-1 at 6.]

### 9. Probationary Period from June 2015 to May 2016

Officer Cosby was provided no guidance or expectations for his 12-month probation. [Filing No. 43-1 at 7.] In December 2015, Captain Turner told Officer Cosby that he needed to start looking for a new job. [Filing No. 43-1 at 7.] Officer Cosby told Captain Turner that Sergeant Wilson and Lieutenant Wheeler treated him differently than they treated white officers. [Filing No. 43-1 at 7.]

During his monthly evaluations, Officer Cosby "pointed out that [his] numbers had increased." [Filing No. 43-1 at 7.] He was told that the numbers "had not increased enough." [Filing No. 43-1 at 7.] Officer Cosby asked for guidance, such as how many ticket issuances and arrests were expected, but he received no answer. [Filing No. 43-1 at 7.] A performance comparison between Officer Cosby and the other officers on his shift (a total of four officers) from May 1, 2015 to May 31, 2016 showed that Officer Cosby performed 198 "reports," while all officers on his shift averaged 362 reports; 1237 "runs," while his shift averaged 1671, and 15 arrests, above the shift average of 14. [Filing No. 38-14 at 1.]

Officer Cosby was also asked about taking 15-minute work breaks, called "Code 2 breaks." [Filing No. 43-1 at 7.] Officers are entitled to two Code 2 breaks per day. [Filing No. 43-1 at 7.] Officer Cosby explained that he used his Code 2 breaks to use the bathroom while in the

community because his blood pressure medication causes him to use the bathroom frequently.

[Filing No. 43-1 at 7.]

### 10. May-June 2016 Suspension

On April 26, 2016, the Disciplinary Board of Captains again recommended that Officer

Cosby be suspended for continued deficient performance and engaging in off-duty employment

without completing the necessary paperwork.  [Filing No. 38-13 at 1.]  The Board explained as

follows:

> On May 28, 2015 Officer Richard Cosby was suspended and in that determination he was ordered in writing by Chief Richard Hite that "You will be on performance probation for 12 months with monthly evaluations on your professional conduct, performance and self-initiated activity." As part of Lt. Lawrence Wheeler's monthly evaluations of Officer Cosby he reviewed his CAD's to monitor his performance and kept track of his work product. He and the other supervisors on day shift additionally had several discussions with him about what we expected of him both in writing and verbally.
>
> During review of Officer Richard Cosby's CAD's during the last four months Lt. Wheeler and other supervisors found several irregularities and issues with his performance. His production has been low during the past four month period (July 2015- October 2015.) During that time he only had 28 reports, 5 UTT's, 9 traffic stops and only 1 arrest (for a robbery suspect a security officer caught.) Officer Cosby's self- initiated activity has been very low. He made no self-initiated arrests, no traffic violations tickets, no summons, he didn't stop anyone walking, and not one report that he wasn't dispatched to take. On the other hand, he made a total of 130 administrative mark outs during this same time period. Each one of these mark outs reset him to the bottom of the run queue so that his zone partners got the next run instead of him.
>
> Officer Richard Cosby marked himself (SIG/28-Detail) in Interact 32 times when he only had 28 Interact reports. He has not been making ARIES crash reports for hit and run accidents. He has been marking himself out at the fuel line or roll call then staying marked out until the end of his shift. He marked out on off duty employment on 08-15-15, 2345 hours, at 6447 W. Washington Street Club Live without having an Off Duty Employment form turned in. Officer Cosby was ordered by Sgt. T-Mike Wilson to not take a lunch break after 1400 hours. He took 13 Code 3's after 1400 hours during this four month period. This was in direct contradiction of Sgt. Wilson's order.
>
> Officer Richard Cosby's performance is very poor and he will not participate in any self-initiated activity. He has previously been suspended for the same issues.

[Filing No. 38-13 at 1.]  Aside from the evidence discussed in the preceding sections, Officer

Cosby does not controvert any of the Board's findings.

Chief Troy Riggs agreed with the Board's recommendation.  [Filing No. 38-13 at 4.]  In

addition to a 30-day suspension, imposed on dates beginning on May 12, 2016 and ending on June

25, 2016, Chief Riggs directed Officer Cosby to "enroll in the Employee Assistance Program

(EAP) for an assessment" and to complete a "12-month Remediation Plan . . . that includes specific

goals/objectives that you will need to address during that time period." [Filing No. 38-13 at 4.]

The remediation plan, as memorialized in a memorandum from Sergeant Wilson, provided as follows:

1. Officer Cosby shall complete a Unit Activity Log sheet each day to document his daily patrol activities, to include case numbers and CAD numbers if Interact Reports or Aries Crash Reports are taken. Officer Cosby will turn the Activity Log into his supervisor at the beginning of the following shift.

2. Officer Cosby will utilize the department-issued radio to mark out for all activity, including checking premises, code 3's, and details, unless the radio channel is restricted due to high priority incidents. If the channel is restricted, Officer Cosby will utilize Zclient on his laptop to mark himself out of service with detailed notes on his activity.

3. Officer Cosby will display beat or zone responsibility by taking the runs that come out on his zone and he will back-up the other officers on the shift and on his zone. Officer Cosby will actively patrol his assigned zone when not taking dispatched runs or completing reports.

4. Officer Cosby will manage his time during his tour of duty, as a 2nd roll call dayshift officer, so that he keeps himself available for dispatched runs during shift change between the hours of 1300 and 1500 hours daily. Officer Cosby will assist 1st roll call officers in getting relieved on time to go 10-42 by 1400 hours.

5. Officer Cosby will complete all interact reports by the end of his shift and all crash reports within the 24 hour time limit per general order 7.1.

6. Officer Cosby will attend refresher training for Crash Reports through the IMPD Training Academy and review General Order 7.1.

7. Officer Cosby will obtain a Fitness for Duty evaluation.

8. While conducting investigations and handling dispatched runs, Officer Cosby will complete the investigation and/or handle the run within a reasonable amount of time and then immediately mark back in service. Officer Cosby will request assistance from another officer or a supervisor if he needs assistance completing an investigation in a timely manner.

[Filing No. 38-15 at 1-2.]

Officer Cosby complied with the remediation plan. [Filing No. 43-1 at 8.]

### 11. February 2017 Suspension

Officer Cosby's most recent discipline was the result of an incident that occurred on October 16, 2016. As the Disciplinary Board of Captains summarized:

> On October 16, 2016 at approximately 0231 hours Officer Cosby was dispatched on missing persons run. Officer Cosby spoke with a concerned father in reference to his missing 6 year old daughter. The custodial parent, Mr. Smith, expressed to Officer Cosby that his ex-wife had his daughter. Mr. Smith stated he hadn't heard from her in several hours and he was concerned for the health and welfare of his daughter. After talking with Mr. Smith, Officer Cosby left the scene without doing a report and advised Mr. Smith to call around 0800 hours if he hadn't heard from his ex-wife.

[Filing No. 38-16 at 3.] Chief Bryan Roach found, as the Board recommended, that Officer Cosby's conduct violated IMPD procedures requiring that the Missing Persons Unit be contacted while the officer is conducting the investigation if the missing child is less than 12 years of age. [Filing No. 38-16 at 2-5.] Additionally, IMPD procedures and state law require officers to report the missing person's information within two hours of receipt to the "appropriate unit in order for it to be entered into IDACS/NCIC." [Filing No. 38-16 at 4-5.] On February 16, 2017, Chief Roach imposed a five-day suspension effective February 10 and directed Officer Cosby to complete a remediation plan. [Filing No. 38-16 at 1.]

According to Officer Cosby, this discipline was unwarranted. [Filing No. 43 at 8.] Officer Cosby explains that he received a call while working late shift on October 16, 2016. [Filing No. 43-1 at 8.] When he arrived, he spoke to a man who said that "his daughter was with her mother and he could not reach her." [Filing No. 43-1 at 8.] Officer Cosby asked if the man's daughter was in danger, and he said no. [Filing No. 43-1 at 8.] Rather, the man had spoken to the mother earlier and was told that the daughter was sick. [Filing No. 43-1 at 8.] The man was also able to contact the mother's parents, and they said that "everything was fine." [Filing No. 43-1 at 8.] The man remained unsure of what to do, so Officer Cosby "suggested that he wait until morning and if he still had not heard anything, to call 911 and an officer would be sent to generate a report." [Filing No. 43-1 at 8.] The next morning, another officer followed up and confirmed that the man had heard from his daughter's mother and that everything was okay. [Filing No. 43-1 at 8.]

### B. Other Officers' Discipline

Officer Cosby is "not aware of any white officers being suspended" during his time working for Sergeant Wilson, Lieutenant Wheeler, and Captain Turner, but he "know[s] of two black officers who were[:] Chester Gooch and Shaniqua Haywood." [Filing No. 43-1 at 8.] Officer Cosby believes that he was "closely scrutinized" and that "every time [he] made [the] most minor screw-up, [he] was disciplined and the discipline[] was constantly increased." [Filing No. 43-1 at 9.]

### C. Procedural History

Officer Cosby filed this lawsuit on November 10, 2017, alleging two race discrimination claims under Title VII. [Filing No. 1.] Count I of his complaint alleges that IMPD subjected Officer Cosby to a racially hostile work environment. [Filing No. 1 at 2-3.] Count II alleges that he was unfairly disciplined on account of his race. [Filing No. 1 at 3-4.]

On October 10, 2018, the IMPD filed its Motion for Summary Judgment, arguing that Officer Cosby's claims fail as a matter of law. [Filing No. 36.] The IMPD's Motion is fully briefed and ripe for decision.

### IV.
### DISCUSSION

Both of Officer Cosby's race discrimination claims, for a hostile work environment and for discriminatory discipline, rest upon the same allegations that IMPD repeatedly punished Officer Cosby because of his race. In its Motion for Summary Judgment, the IMPD raises what is essentially one argument as to why it is entitled to summary judgment on both claims—that no evidence connects IMPD's actions and disciplinary decisions to Officer Cosby's race. [Filing No. 37 at 8-12.] In response, Officer Cosby argues that Sergeant Wilson's comment ("I heard about you and I will be keeping my eyes on you"), Captain Turner's comment (that Officer Cosby needed

to find another job), and the punishments Officer Cosby received (for conduct for which white officers were not punished) combined raise a reasonable inference of race discrimination. [Filing No. 43 at 10-15.]

Title VII prohibits employment discrimination based on race. 42 U.S.C. § 2000e–2(a). A plaintiff in a race discrimination case must demonstrate that a reasonable jury could find

> [1] he is a member of a class protected by the statute, [2] that he has been the subject of some form of adverse employment action (or that he has been subjected to a hostile work environment), and [3] that the employer took this adverse action on account of the plaintiff's membership in the protected class.

*Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (internal quotation omitted) (brackets in original). As *Abrego* explains, the elements of Officer Cosby's hostile work environment claim track his race discrimination claim, except instead of demonstrating an adverse employment action, he must demonstrate that he has been subject to severe or pervasive harassment on account of his race. *See id.*; *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018).

At issue in Officer Cosby's case is the causation element, which requires the plaintiff to "demonstrate a triable issue as to whether discrimination motivated the adverse employment action" or hostile work environment. *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). The Seventh Circuit's landmark decision in *Ortiz v. Werner Enterprises, Inc.* clarified how courts should conduct the causation analysis on summary judgment:

> Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect."

834 F.3d 760, 765 (7th Cir. 2016). But even though courts are no longer bound by rigid tests tied to different categories of evidence, the plaintiff must still demonstrate that "the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other employment action." *Id.* This requires more than "merely repeat[ing] that [the plaintiff] believes he was treated differently from coworkers because of his race" because "personal beliefs are insufficient to give rise to a genuine factual dispute." *Abrego*, 907 F.3d at 1014. It likewise requires more than "[s]imply being a member of a protected class, without something more to link that status to the action in question." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016).

Officer Cosby's effort to demonstrate a genuine issue of material fact tying his suspensions—upon which he relies as both the adverse employment actions for his race discrimination claim and as the severe or pervasive harassment for his hostile work environment claim—to his race suffers from a complete lack of evidentiary support. For starters, the two comments to which Officer Cosby points do not evince any discriminatory animus. Sergeant Wilson's comment, "I heard about you and I will be keeping my eyes on you," and Captain Turner's comment that Officer Cosby needed to find another job do not suggest that they were punishing Officer Cosby because of his race, nor does Officer Cosby provide any context that would lend itself to such an inference. Rather, given that the comments followed Officer Cosby's discipline for various incidents, the only reasonable inference based upon the evidence before the Court is that they were made out of concern for Officer Cosby's performance.

Officer Cosby's complaints about his discipline do not fare any better. By arguing that much of his discipline was unwarranted and that he was selectively disciplined, Officer Cosby apparently suggests that the reasons given for his discipline were pretext for discrimination. For

this evidence to carry Officer Cosby past summary judgment, it must "raise a genuine issue about the honesty, not the accuracy, of [the IMPD's] belief" that his conduct warranted discipline. *Simpson v. Beaver Dam Cmt. Hosps., Inc.*, 780 F.3d 784, 797 (7th Cir. 2015).

But Officer Cosby merely nitpicks at several of his supervisors' disciplinary decisions. He does not, moreover, dispute that he sent Sergeant Jefferson a message saying that he was "sick and tired of you," which led to his May 2014 suspension, [Filing No. 38-5 at 1]; that officers had complained about him and that he had shown up late and "mark[ed] out on [Patrol When Possible] for an excessive amount of time," [Filing No. 38-7 at 1], which was reflected in his February 2015 performance review; that his "report" and "run" numbers were substantially lower than the rest of the officers on his shift, [Filing No. 38-14 at 1]; or that he had failed to make hit-and-run crash reports and failed to file the required paperwork before engaging in off-duty employment, which in part led to his 30-day suspension in May 2016, [Filing No. 38-13 at 1], to list just a few examples. At most, Officer Cosby's evidence suggests that he disagrees with the IMPD's interpretation and application of its policies and procedures. To take one poignant example, Officer Cosby suggests that his February 2017 suspension for failing to report a six-year-old missing child to the Missing Persons Unit was nothing but harassment because the father told him that the child was not endangered. However, the uncontroverted evidence establishes that IMPD procedures require all officers to contact the Missing Persons Unit when the child is less than 12 years of age, regardless of the circumstances. [Filing No. 38-16 at 2.] Nothing about that statement suggests that there is any exception for when a father says that he believes his child is okay.

Officer Cosby also fails to demonstrate that he was selectively disciplined for actions for which white officers were not held accountable. The only evidence he offers to support this assertion are statements that he was "not aware of any white officers being suspended" and his

belief that he was "closely scrutinized" and "treated differently than the white officers were." [Filing No. 43-1 at 8-9.] "But at summary judgment [Officer Cosby does] not submit admissible evidence of other [officers] receiving favorable treatment—i.e., not being disciplined after engaging in misconduct—nor [does Officer Cosby] supply a foundation for the contention that" no white officers have been suspended for conduct similar to his. *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 662 (7th Cir. 2016). "Instead, [Officer Cosby] present[s] only vague, conclusory assertions about incidents outside [his] personal knowledge." *Id.* If Officer Cosby believed that a comparator engaged in conduct similar to his, it was incumbent upon him to procure admissible evidence through discovery regarding that comparator and then offer that evidence to support the comparison. It appears that Officer Cosby either chose not to do so, as no depositions, interrogatory answers, or documents produced by IMPD were submitted with his response, or his discovery revealed no such comparator. He cannot rectify the situation with conclusory statements about his belief regarding how the IMPD has treated other officers. *See id.*

In the end, the most Officer Cosby's evidence suggests is that, at times, the IMPD may have ignored his concerns, misjudged his work effort, or held him to a strict standard. But it is not the Court's "province to decide whether [the IMPD's explanations for its decisions were] wise, fair, or even correct . . . so long as [the explanations] truly [were] the reason[s]" for the suspensions. *Simpson v. Beaver Dam Cmty. Hosps.*, 780 F.3d at 795. Officer Cosby fails to demonstrate a genuine issue of material fact as to whether the IMPD honestly believed the reasons it gave for his discipline, and no other evidence raises the inference that Officer Cosby was punished because of his race. Because Officer Cosby relies upon the IMPD's disciplinary decisions to support both his race discrimination claim and his hostile work environment claim, and because Officer Cosby has

failed to causally connect the discipline to his race, the IMPD is entitled to summary judgment on Officer Cosby's complaint.

## V.
### CONCLUSION

The Seventh Circuit has frequently said that "summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson*, 325 F.3d at 901 (internal quotation omitted). Officer Cosby clearly believes that he was unfairly disciplined. But "[i]t is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee," *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012), because "this court does not act as a superpersonnel department," *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017) (internal quotation omitted). "Rather, the only question is whether the employer's proffered reason [for the adverse employment action] was pretextual, meaning that it was a lie." *Coleman*, 667 F.3d at 852. Aside from his subjective assessment of the situation, Officer Cosby fails to provide any evidence which suggests that race had anything to do with his discipline or which undermines the IMPD's proffered explanations for his discipline. The Court therefore **GRANTS** the City and IMPD's Motion for Summary Judgment. [36] Final judgment will issue accordingly.

Date: 1/30/2019

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**